DECISION
{¶ 1} Relator, Ronald W. Ray, has filed this original action requesting that this court issue a writ of mandamus ordering respondent Industrial Commission of Ohio ("commission") to vacate its order denying him permanent total disability ("PTD") compensation and to enter an order granting said compensation.
 {¶ 2} This matter was referred to a court-appointed magistrate pursuant to Civ.R. 53(C) and Loc.R. 12(M) of the Tenth District Court of Appeals. The magistrate issued a decision, including findings of fact and conclusions of law, and recommended that this court deny relator's request for a writ of mandamus. (Attached as Appendix A.) Relator has filed an objection to the magistrate's decision.
 {¶ 3} Relator fails to raise any new issues in his objection and merely reiterates his arguments presented to the magistrate. Relator simply disagrees with the magistrate's interpretation of the well-settled case law. However, we agree with the magistrate that Dr. Joseph Kearns' report constituted "some evidence," and Dr. Kearns was not required to consider relator's cerebral palsy when rendering a finding as to relator's residual functional capacity. We concur with the magistrate's opinion that Dr. Kearns was prohibited from considering relator's cerebral palsy in determining his residual functional capacity based upon State exrel. Waddle v. Indus. Comm. (1993), 67 Ohio St.3d 452, which held that non-allowed conditions cannot be used to advance a claim for PTD compensation. We have recently applied Waddle
under analogous circumstances to find that the commission properly rejected a vocational report that was based in part on non-allowed conditions, including Type 2 diabetes, a heart attack, and two arterial stents. See State ex rel. Wheeler v.Indus. Comm., Franklin App. No. 03AP-93, 2004-Ohio-840, at ¶ 8, 64. Although the non-allowed conditions in both Waddle andWheeler arose after the industrial injury, such fact is irrelevant to the underlying proposition that non-allowed conditions cannot be used to advance a PTD claim. We fail to see why the fundamental rationale for the holding in Waddle would be any less valid if the non-allowed conditions in these cases were congenital or existed prior to the industrial injury. See, also, generally, State ex rel. Brower v. Indus. Comm. (Dec. 26, 1995), Franklin App. No. 94APD10-1563 (recovery where the impairment arising from an allowed condition combines with the impairment arising from an unrelated, non-allowed condition to produce a disability would violate Waddle). For these reasons, relator's objection is without merit.
 {¶ 4} After an examination of the magistrate's decision, an independent review of the record pursuant to Civ.R. 53, and due consideration of relator's objection, we overrule the objection and find that the magistrate sufficiently discussed and determined the issues raised. Accordingly, we adopt the magistrate's decision as our own, including the findings of fact and conclusions of law contained in it, and deny relator's request for a writ of mandamus.
Objection overruled; writ denied.
Lazarus, P.J., and Petree, J., concur.
 APPENDIX A IN THE COURT OF APPEALS OF OHIO TENTH APPELLATE DISTRICT
State of Ohio ex rel. Ronald W. Ray, : Relator, : v. : No. 03AP-1189 Columbus Developmental Center : (REGULAR CALENDAR) and Industrial Commission of Ohio, : :
Respondents. :
 MAGISTRATE'S DECISION Rendered on August 13, 2004 Koltak Gibson, L.L.P., and Peter J. Gibson, for relator.
Jim Petro, Attorney General, Lisa R. Miller and Lee M.Smith, special counsel for respondent Columbus Developmental Center.
Jim Petro, Attorney General, and Phil Wright, Jr., for respondent Industrial Commission of Ohio.
 IN MANDAMUS {¶ 5} In this original action, relator, Ronald W. Ray, requests a writ of mandamus ordering respondent Industrial Commission of Ohio ("commission") to vacate its order denying him permanent total disability ("PTD") compensation, and to enter an order granting said compensation.
Findings of Fact:
 {¶ 6} 1. On January 22, 1979, relator sustained an industrial injury which is allowed for "traumatic myositis of the right arm, cervical spine and low back; cephalgia; aggravation of pre-existing adjustment disorder with depressed mood," and is assigned claim number PE658821.
 {¶ 7} 2. On January 31, 2003, relator filed an application for PTD compensation. In support of his application, relator submitted a report from Ronald C. Van Buren, M.D., stating:
* * * He was granted permanent partial disability by the Bureau of Worker's Compensation for work related injuries sustained January 22, 1979. The diagnoses were 1)Traumatic myositis of right arm, cervical spine and low back, 2) Cephalgia, 3) Aggravation of pre-existing adjustment disorder with depressed mood.
Since this injury, Mr. Ray has persisted with pain, muscle cramping in the right arm, lowback [sic], and legs, spasticity, difficulty in gripping or holding objects in his hand, and difficulty in maintaining a position of standing/sitting greater than 10-15 minutes.
* * *
In addition to the above diagnosis [sic], Mr. Ray has cerebral palsy. In my opinion, he is permanently and totally disabled from returning to his former employment as a custodian/cook/maintenance employee or any other type of work. * * *
 {¶ 8} 3. In further support of his application, relator submitted a report, dated August 31, 2001, from Terry K. Thompson, Ph.D., stating:
* * * I write this letter to summarize my treatment of Mr. Ray and to discuss the predictable effects of his psychological condition on his ability to perform in the world of work. Mr. Ray first met with me on December 10, 1998 and has participated in fourteen therapy sessions.
Mr. Ray's allowed psychological condition (depressive disorder) has improved to a certain degree. The previously observed symptoms including depressed mood, anxiety and agitation, and affective lability have diminished in severity and frequency. Thus he would not currently be considered permanently and totally disabled based solely upon his psychological condition. However, that condition would predictably still impact on any workplace performance. Mr. Ray exhibits difficulties in concentration, ability to focus, and organization (additional typical symptoms of a depressive disorder) that would in all likelihood create problems in any job setting. Also, while he currently exhibits diminished anxiety and emotional lability, I suspect attempting to meet the needs of the required structure of any workplace would result in markedly increased symptomology. The characteristics of a job which he might successfully perform (from a psychological standpoint) include a flexible schedule, minimal supervision, and relatively solitary setting, and no significant training component.
 {¶ 9} 4. On April 23, 2003, at the commission's request, relator was examined by Joseph Kearns, D.O., who specializes in occupational medicine. Dr. Kearns wrote:
* * * Regarding headache or cephalgia, Fourth Edition Guidelines do not allow a specific impairment for such conditions. Regarding the traumatic myositis of his right arm, he really was nontender in the right arm and had no symptoms in the right arm relating to his injury, and as such a zero percent impairment is suggested. Regarding the cervical spine, [a]ccording to Table 73, he would be in Diagnosis Related Estimates impairment Category II with clinical signs of an injury but without radiculopathy or loss of motion segment integrity, and a 5% impairment is suggested. Regarding his lumbar spine, he would be in Diagnosis Related Estimates impairment Category II according to Table 72 with a minor impairment but no radiculopathy or loss of motion segment integrity, and as such a 5% impairment is suggested. The above would combine into a total whole person permanent partial impairment of 10% for all aboveevaluated conditions.
* * * I am merely listing limitations attributable to his injury and not his underlying medical status such as cerebral palsy.
 {¶ 10} 5. Dr. Kearns also completed a physical strength rating form on which he indicated that relator can perform "medium work."
 {¶ 11} 6. On April 16, 2003, relator was examined by clinical psychologist, Pamela Chapman, Ph.D. Dr. Chapman reported:
1. Mr. Ray has reached maximum medical improvement as it is unlikely that his symptoms of depression will change substantially by more than 3% in the next year without medication. He has received psychological treatment for about six to twelve months. He is not currently taking antidepressant medications that would be helpful. In addition, and given the recent death of his mother, Mr. Ray stated that he is "handling it" and therefore does not need to talk with his psychologist about his depressive symptoms or his injury, although therapy would be helpful.
2. Using the AMA Guidelines to the Evaluation of Permanent Impairment (4th Edition), I would estimate a 15% permanent impairment arising from the allowed psychological condition.
3. Occupational Assessment:
a. Allowed psychological condition alone does not prevent Mr. Ray from returning to his former employment.
b. He is capable of sustaining remunerative employment specifically as it relates to his psychological condition.
 {¶ 12} 7. The commission also requested an employability assessment report from Samuel H. Osipow, Ph.D., a vocational expert. The Osipow report responds to the following query:
Based on your separate consideration of reviewed medical and psychological opinions regarding functional limitations which arise from the allowed condition(s), identify occupations which the claimant may reasonably be expected to perform (A) immediately after and/or (B) following appropriate academic remediation or brief skill training.
 {¶ 13} Indicating acceptance of the reports of Drs. Chapman and Kearns, and responding to the above query, Osipow listed the following employment options: "packer; sorter; stuffer; inspector; assembler; surveillance system monitor."
 {¶ 14} Under "III. Effects of other employability factors," Osipow wrote:
1. Question: How, if at all, do the claimant's age, education, work history or other factors (physical, psychological, and sociological) effect his/her ability to meet basic demands of entry level occupations?
Answer: Age: As a person of middle age the claimant should be able to meet the basic demands of entry level occupations.
Education: Even though he was in special education, his high school diploma would indicate that he should be able to meet the basic demands of entry level occupations.
Work history: His work history indicates that he has been able to meet the basic demands of entry level occupations.
Other: Uses a cane/back brace. History of congenital cerebral palsey which results in moderate to severe dysarthria and difficulty walking. He is able to drive, occasionally shoot pool, go to church/movies, cook, wash dishes, empty trash. Current medication not known.
2. Question: Does your review of background data indicate whether the claimant may reasonable develop academic skills or other skills required to perform entry level sedentary or light jobs?
His academic background indicates the [sic] he may be expected to reasonably develop academic or other skills required to perform entry level sedentary or light jobs.
3. Question: Are there significant issues regarding potential employability limitations or strengths which you wish to call to the SHO's attention?
Per psych reported dated 3-0-00 [sic] he was receiving $500 per month in Social Security Disability benefits (no starting date given).
He states that he received rehabilitation through BVR, Goodwill Industries, and Vinsion (sic) Center Industries.
Under "IV. Employability Assessment database," Osipow wrote:
B. Work history
Job title *** skill level strength level dates
1. custodian *** unskilled (SVP 2) heavy 68-79
2. youth worker *** semi-skilled (SVP 6) light 65-68
 3. elevator *** unskilled (SVP 2) light unknown operator
 4. mess *** semi-skilled (AVP 3) medium 1960's attendant
C. WORK HISTORY
Highest grade completed: 12th
Date of last attendance: 1968 HS graduate: yes (special education) GED ?: no Vocational Training: none ICO Educational Classification: high school graduate
 {¶ 15} 8. Following a July 23, 2003 hearing, a staff hearing officer ("SHO") issued an order denying relator's PTD application. The SHO's order states:
This order is based particularly upon the reports of Drs. Chapman and Kearns.
The claimant was injured on 01/22/1979. On that date he fell on snow and injured his right arm, neck, and low back. This claim has also been allowed for cephalgia and a psychological condition.
Based on the reports of Drs. Chapman and Kearns it is found that the claimant has the residual ability to perform medium level work. Considering that the claimant can perform medium level work, claimant's disability factors will next be examined to determine what impact those factors have on claimant's ability to perform medium level work.
In that light the record reveals the following disability factors: the claimant is 55 years old (he was 30 when he was injured in 1979), he graduated from high school, and he has worked as a custodian, youth worker, elevator operator, and mess attendant.
The claimant's present age is 55. However, it is important to note that the claimant was only 30 years old when he last worked. At age 30 the claimant would have been young enough to undergo a rehabilitation or retraining program such that he could have qualified for medium or light work. In this regard the claimant testified at hearing that he possesses basic reading and writing skills and can do basic arithmetic. Therefore, there was no reason why the claimant could not have undergone retraining since he last worked in 1979. Consequently, it is found that the claimant has not exhausted all reasonable avenues with respect to participation in a ret[r]aining program that could have qualified him for work within his residual capacity.
In regards to claimant's obligation to pursue retraining or rehabilitation the following case law is cited.
The cases of State ex rel. Speelman v. Indus. Comm. (1992)73 Ohio App.3d 757, State ex rel. B.F. Goodrich v. Indus. Comm.
(1995) 73 Ohio St. 3d 525 and State ex rel. Bowling v. Natl. CanCorp. (1996) 77 Ohio St. 3d 148 stand for the proposition that a claimant has a responsibility to undergo appropriate and reasonable medical and/or vocational rehabilitation which will either enable a claimant to increase the residual functional capacity and/or obtain new marketable employment skills and thereby increase his potential employability. Furthermore, Stateex rel. Wilson v. Indus. Comm. (1997) 80 Ohio St.3d 250 stands for the proposition that it is not unreasonable to expect a claimant to participate in return to work efforts to the best of his or her abilities or to take the initiative to improve re-employment potential. Wilson also states that permanent total disability compensation is "compensation of last resort." In this case, the Industrial Commission finds that the injured worker has not exhausted all reasonable avenues with respect to permanent total disability.
For the record it is noted that the claimant testified that he did briefly participate in a rehabilitation program through Vinision Center Industries in 1979. He testified he left the program after two or three weeks due to pain. However, there is no documentation of claimant's participation in this program, only claimant's unsupported testimony of such participation. Consequently, without documentation of such participation, claimant's testimony of this rehabilitation effort is not found credible and is not accepted.
Claimant's education, a high school graduate, is found to have given claimant the basic literary skills to participate in retraining. As mentioned earlier the claimant stated he can read, write, and do basic arithmetic. The claimant did state he was in special education classes throughout school, but his placement in these classes appears to have been done because of his underlying cerebral palsy, a physical disability, and not due to any documented mental deficiency.
As noted previously the claimant has worked as a custodian, youth worker, elevator operator, and mess attendant. While these occupations may not have given claimant directly transferable skills for medium or light work, it is nevertheless found for the reason mentioned earlier (adequate literacy skills and only 30 when last worked) that the claimant had the ability and opportunity to learn work skills such that he could have qualified for medium or light level work.
In conclusion, based on claimant's residual medium level ability to work, and considering his academic ability and past opportunity to retrain for medium or lighter level work such that he could have found employment commensurate with his residual capacity, the claimant is not found to be permanently and totally disabled.
Lastly, claimant's counsel opined that it was necessary for Dr. Kearns, the specialist who stated claimant could do medium level work exclusion of unrelated cerebral palsy condition, to state what claimant's residual capacity was taking into account the claimant's underlying cerebral palsy condition.
The Staff Hearing Officer does not accept this proposition as the examining physician need only state what claimant's residual capacity is based solely on the allowed conditions. Dr. Kearn's opinion is solely based on the allowed conditions. There is no legal requirement that the examining physician opine on residual capacity as it relates to underlying nonallowed conditions, only that the residual capacity opinion reflect only consideration of all allowed conditions.
(Emphasis sic.)
 {¶ 16} 9. On September 24, 2003, the commission mailed an order denying relator's request for reconsideration of the SHO's order of July 23, 2003.
 {¶ 17} 10. On December 2, 2003, relator, Ronald W. Ray, filed this mandamus action.
Conclusions of Law:
 {¶ 18} The issue is whether the reports of Dr. Kearns constitute some evidence upon which the commission can rely, given that Dr. Kearns did not consider relator's cerebral palsy in rendering a finding as to relator's residual functional capacity.
 {¶ 19} Finding that Dr. Kearns' reports do constitute some evidence upon which the commission can rely in adjudicating relator's PTD application, it is the magistrate's decision that this court deny relator's request for a writ of mandamus, as more fully explained below.
 {¶ 20} Ohio Adm. Code 4121-3-34 sets forth the commission's rules for the adjudication of PTD applications. Ohio Adm. Code4121-3-34(B) sets forth definitions applicable to the rules. Ohio Adm. Code 4121-3-34(B)(4) states:
"Residual functional capacity" means the maximum degree to which the claimant has the capacity for sustained performance of the physical-mental requirements of jobs as these relate to the allowed conditions in the claim(s).
 {¶ 21} Ohio Adm. Code 4121-3-34(D) sets forth "[g]uidelines for adjudication of applications for permanent total disability." Ohio Adm. Code 4121-3-34(D)(2)(b) states:
If, after hearing, the adjudicator finds that the claimant, based on the medical impairment resulting from the allowed conditions is unable to return to the former position of employment but may be able to engage in sustained remunerative employment, the non-medical factors need be considered by the adjudicator.
The non-medical factors that are to be reviewed are the claimant's age, education, work record, and all other factors, such as physical, psychological, and sociological, that are contained within the record that might be important to the determination as to whether the claimant may return to the job market by using past employment skills or those skills which may be reasonably developed. * * *
 {¶ 22} In State ex rel. Waddle v. Indus. Comm. (1993),67 Ohio St.3d 452, the Supreme Court of Ohio, in a seminal decision, defined the role nonallowed conditions shall play in a PTD determination.
 {¶ 23} In Waddle, the PTD claimant suffered from a severe nonallowed cardiac condition. There was medical evidence that the nonallowed cardiac condition alone precluded all sustained remunerative employment.
 {¶ 24} One of the parties in Waddle argued that the nonallowed conditions are Stephenson[1] factors that must be considered in the PTD determination. The employer argued that the claimant's totally disabling nonallowed conditions automatically precluded a finding of PTD regardless of the severity of the allowed conditions.
 {¶ 25} The court in Waddle held that nonallowed conditions may never be used to advance or defeat a PTD application; however, the mere presence of nonallowed conditions does not automatically bar PTD compensation. The Waddle court observed that Stephenson was never intended to permit the commission to base a PTD award on nonallowed conditions, either in whole or in part.
 {¶ 26} Here, relator asserts that Dr. Kearns' reports are defective because, allegedly, the doctor "does not take into account the impact that the allowed conditions have on the PTD applicant's residual functional capacity." (Relator's brief at 5.)
 {¶ 27} Relator's above-quoted assertion indicates a misunderstanding of the definition of "residual functional capacity." Relator seems to suggest, incorrectly, that "residual functional capacity" relates to the claimant's general health status prior to the industrial injury or irrespective of the industrial injury. Contrary to relator's suggestion, "residual functional capacity" relates to the allowed conditions of the claim. The medical doctors are asked to determine the claimant's residual functional capacity as it relates to the allowed conditions of the claim.
 {¶ 28} Dr. Kearns appropriately determined relator's residual functional capacity to be at the "medium work" level based upon the allowed conditions of the claim without regard to relator's cerebral palsy. Given the commission's rules for the adjudication of PTD applications and well-settled law defining the role of nonallowed conditions in the PTD determination, it is clear that Dr. Kearns' reports constitute some evidence upon which the commission can and did rely.
 {¶ 29} Relator misplaces his reliance upon Hamilton v.Keller, Admr. (1967), 11 Ohio App.2d 121, wherein the Court of Appeals for Allen County states:
Employers take their workmen as they find them and assume the risk of having a weakened condition aggravated by some injury which might not hurt or bother a perfectly normal, healthy person. If that injury is the proximate cause of the death or disability for which compensation is sought, the previous physical condition is unimportant and recovery may be had independently of the pre-existing weakness or disease.
 {¶ 30} Relator seems to suggest that Hamilton supports his view that the commission was required to consider relator's cerebral palsy in determining residual functional capacity or in considering the Stephenson factors. Relator is incorrect in this suggestion.
 {¶ 31} To begin, the decision in Hamilton arose from an appeal of a judgment of the common pleas court determining that the plaintiff (widow of the deceased injured worker) was entitled to participate in the state insurance fund. In Hamilton, the injured worker died of an acute myocardial infarction brought on by his shoveling of snow. Apparently, he had a preexisting disease that produced coronary circulatory insufficiency. InHamilton, the administrator of the Bureau of Workers' Compensation argued in its appeal that the injury was not compensable because the decedent suffered from a preexisting progressive disease process which finally progressed to the point where the stress of his ordinary work activity caused his death.
 {¶ 32} Several observations are in order. First, this original action does not involve a determination of the right to participate in the state insurance fund as did Hamilton.
Relator's right to participate has already been established. There is no question here as to the allowed conditions of the industrial claim. There is no question that the industrial claim is not allowed for cerebral palsy nor is it allowed for an aggravation of the cerebral palsy.
 {¶ 33} Apparently, relator has never claimed before the commission that the industrial injury has impacted his preexisting cerebral palsy. Accordingly, there is no claim allowance or right to participate for such a claim.
 {¶ 34} In effect, relator asks this court to ignore well-settled law, something this court cannot do.
 {¶ 35} Accordingly, it is the magistrate's decision that this court deny relator's request for a writ of mandamus.
[1] State ex rel. Stephenson v. Indus. Comm. (1987),31 Ohio St.3d 167.